# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| MARLENE D. MCCLINTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 C 4814 |
| v. | ) | |
| | ) | Magistrate Judge |
| MICHAEL J. ASTRUE, | ) | Maria Valdez |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This action was brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying Plaintiff Marlene McClinton's claim for Disability Benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, McClinton's motion for summary judgment [Doc. No. 24] is granted in part and denied in part, and Defendant's motion for summary judgment [Doc. No. 38] is denied. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

**BACKGROUND**

## I.     PROCEDURAL HISTORY

Plaintiff Marlene McClinton ("Plaintiff," "Claimant," or "McClinton") originally filed an application for a period of disability and disability insurance benefits on June 20, 2005, alleging disability beginning June 29, 2004. (R. 52.) Plaintiff's claim was denied initially on February 27, 2006, and upon reconsideration on August 17, 2006. (*Id.*) Plaintiff timely filed a written request for a hearing by an Administrative Law Judge ("ALJ") on August 28, 2006. (*Id.*) On October 6, 2008, Plaintiff personally appeared and testified at the hearing and was represented by counsel. (*Id.*) An impartial vocational expert, Glee Ann L. Kehr, also appeared at the hearing. (*Id.*)

On November 12, 2008, the ALJ denied Plaintiff's claim and found her "not disabled" under the Social Security Act. (*Id.* at 63.) The Social Security Administration Appeals Council denied Plaintiff's request for review on May 11, 2009. (*Id.* at 3.) The ALJ's decision thus became reviewable by the District Court under 42 U.S.C. § 405(g), *see Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005), and Plaintiff filed the instant motion on March 19, 2010.

## II.   FACTUAL BACKGROUND

### A.   <u>Background</u>

McClinton was born on October 17, 1952 and was fifty-one years old on June 29, 2004, the date on which she claims her disability period began.[1] (R. 19.) Plaintiff claims that a degenerative disease she has in her neck causes pain that prevents her from working. (*Id.*) McClinton first experienced neck pain in 1998, which was of a sudden onset. (*Id.* at 353.) She denies any major fall or injury. (*Id.*) She was diagnosed with a pinched nerve and underwent physical therapy. (*Id.*) The therapy helped moderately and by 1999, she did not have any pain in the neck. (*Id.*) By 2000, the pain returned and became progressively worse. (*Id.*)  The specific impairments Plaintiff alleges include: degenerative disc disease of the cervical spine, spinal stenosis, gastro-esophageal reflux disease, irritable bowel syndrome and degenerative joint disease of both knees. (*Id.* at 30, 54.) Before the accident, Plaintiff worked as an office clerk in a payroll department.[2] (Pl.'s Mot. Summ. J. p. 21) Before that, she worked as a medical transcriptionist. (R. 41.)

McClinton has taken Hydrocodone, Naproxen, Lortab, Naprosyn, Dicyclomine, Ultracet, Hyoscyamine, Aciphex, Nexium and Levbid to treat her

---

[1] Plaintiff noted in the hearing that she was on a medical leave of absence starting in March of 2004. (R. 19.)

[2] Defendant maintains that Plaintiff worked as a "payroll clerk," not an "office clerk." The Court addresses the disagreement below.

symptoms. (*Id.* at 30, 384.) She received cervical neck injections in 2004 without much benefit. (*Id.* at 356.) She has not received physical therapy since 2004, and she has not undergone surgery. (*Id.* at 353, 356.)

**B.    Testimony and Medical Evidence**

### 1.    *McClinton's Testimony*

McClinton's main symptom is severe pain. (R. 19, 21, 28-30.) Her pain is primarily on her head, shoulders, back, and the right side of her body, radiating from her neck. (*Id.* at 29.) The pain is exacerbated by almost any kind of activity. (*Id.* at 21.) Caring for her own personal needs is difficult and she often requires assistance. (*Id.*) She estimates that she could probably stand ten to fifteen minutes before she would have to sit down, and she says that she can "probably walk to the mailbox and back, or maybe a block." (*Id.* at 26.) She was able to minister to people at a nursing home and do some gardening up until Spring of 2008. (*Id.* at 23, 25.) McClinton explained that although surgery has been suggested for her neck, "one doctor told [her] that surgery wouldn't help because of the degenerative nature of [her] joint disease and the fact that [she] has such a severe case of arthritis." (*Id.* at 33.)

### 2.    *Medical Evidence*

#### a.    magnetic resonance imaging and x-rays

On December 23, 2003, a magnetic resonance imaging exam ("MRI") of the cervical spine showed bulging discs identified at C3-C4, C4-C5 and C6-C7, and a significant finding at C5-C6, where there was a fairly large right central disc

4

herniation present, associated with mass-effect. (R. 307.) On August 23, 2004, x-rays showed degenerative changes throughout the cervical spine with disc space narrowing and prominent anterior osteophyte formation extending from C3 through C7, and mild osteophytic encroachment upon neural foramina bilaterally. (*Id.* at 276.) X-rays of the lumbosacral spine showed minimal early degenerative change. (*Id.* at 277.) A September 2004 MRI showed severe multi-level degenerative changes in the cervical spine with disc space narrowing and osteophyte formation. (*Id.* at 284.) In April 2005, an x-ray of Plaintiff's cervical spine showed degenerative changes at C3-C4, C4-C5, C5-C6, and C6-C7, prominent anterior osteophytes at all of those levels, possible very mild disc space narrowing at C4-C5 and C5-C6, and encroachment upon the neural foramina, predominantly at C5-C6 bilaterally. (*Id.* at 283.) In April 2006, an MRI of the right knee revealed a small nonspecific joint effusion in the suprapaterllar bursa and some intrasubstance increased signal in the posterior horn of the lateral meniscus. (*Id.* at 493.) Another MRI of the cervical spine in November 2006 showed little change from the 2004 exam. (*Id.* at 449.) In October 2007, a computerized tomography scan ("CT") of the neck showed no mass, but did show some constriction of the airway at the level of the tonsils, along with scattered nonspecific lymph nodes in the jugular sheath and lateral cervical regions, a couple of thyroid nodules, and a large right-sided calcified disc herniation at C5-C6, flattening the anterior surface of the spinal cord. (*Id.* at 450.)

### b. treating physicians

In August 2004, Plaintiff saw her current primary care physician, Dr. Wanda Hatter-Stewart[3] (a specialist in internal medicine), for an examination secondary to seeking authorization for disability from her job. (*Id.* at 57.) Dr. Hatter-Stewart diagnosed severe multilevel degenerative changes in the cervical spine and disc space narrowing, osteophyte formation, disc bulges, herniation and severe mass effect on the thecal sac. (*Id.* at 289.) Dr. Hatter-Stewart recommended treatment with Ultracet and injections at a pain clinic. (*Id.*) Dr. Hatter-Stewart examined Plaintiff pursuant to her disability claim on August 25, 2005. (*Id.* at 58.) The doctor recounted Plaintiff's symptoms of pain, stiffness and parasthesia, as well as the clinical findings of decreased range of motion and paraspinal tenderness. (*Id.* at 251.) Dr. Hatter-Stewart stated that Plaintiff's prognosis was "guarded" and that her response to the treatment that had been offered had been poor. (*Id.*) Among other conclusions, the doctor reported that Plaintiff's pain symptoms were constantly severe enough to interfere with her attention and concentration, and that Plaintiff's symptoms interfered to the extent that she was unable to maintain persistence and pace to engage in competitive employment. (*Id.* at 252.)

Plaintiff saw Dr. Carol Harris, a pain management specialist, from September 2004 through July 2005. (*Id.* at 58.) At Plaintiff's first appointment, Dr. Harris noted cervical spine flexion of fifteen degrees, extension of twenty degrees,

---

[3] In some areas of the Record, she is referred to as Dr. Hatler-Stewart.

facet tenderness at C3 through C5, decreased motor strength in the left hand and arm, but no sensory deficits. (*Id.* at 291-92.) Dr. Harris diagnosed cervical facet arthopathy and cervical radiculopathy and reported that Plaintiff said that she did not want surgery. (*Id.* at 292.) Plaintiff did agree to cervical epidural steroid injections to diminish a significant portion of her inflammatory response. (*Id.*) Plaintiff later reported that she experienced greater pain after the injections. (*Id.* at 297-300.)

Plaintiff underwent physical therapy from December 2006 through March 2007 for pain related to the activities of daily living. (*Id.* at 59.) At the beginning of therapy, her therapist noted decreased cervical range of motion and tightness in the cervical musculature. (*Id.*) Plaintiff discontinued the physical therapy because she said that any exercise caused pain. (*Id.*)

### c.　　examining, non-treating physicians

On August 24, 2004, Plaintiff underwent a neurologic independent medical examination for the State Employee's Retirement System of Illinois by Dr. Norman V. Kohn, a specialist in neurology. (*Id.* at 57.) During the exam, Plaintiff exhibited full range of motion in all of her joints, no deficit was identified in the proximal portion of her arms, and her motor functions, gait and coordination were normal. (*Id.* at 384-85.) Dr. Kohn also found that Plantiff's reflexes were brisk at the left knee and biceps. (*Id.* at 385.) Dr. Kohn determined that there was clear evidence of cervical spondylosis with spinal cord compression, and some evidence of myelopathy, including brisk reflexes and reflex abnormality. (*Id.*) He found no

specific deficit on examination, but noted that Plaintiff's symptoms are consistent with a syndrome characterized by an anatomic abnormality that causes poorly localized but distracting pain made worse with neck movement. (*Id.*) Dr. Kohn recommended treatment with a soft cervical collar, and opined that without spinal surgery, Plaintiff could be expected to have continued symptoms. (*Id.*) Dr. Kohn indicated that Plaintiff was incapable of performing her job duties. (*Id.* at 288.)

On February 14, 2006, Plaintiff underwent an internal medicine consultative examination for Illinois DHS conducted by Dr. M.S. Patil. (*Id.* at 58.) Dr. Patil noted no deformity of the spine, no paravertebral tenderness or spasm, mildly decreased range of motion of the cervical spine, normal reflexes, unimpaired superficial and deep sensations, unimpaired motor strength, a normal gait, the ability to walk fifty feet without sign of abnormality, and no difficulties with fine and gross manipulation of her hands and fingers. (*Id.* at 353-55.) Dr. Patil's diagnostic impressions were multilevel osteoarthritis and mild to moderate central spinal canal stenosis. (*Id.* at 356.)

### d. non-examining physicians

Following Dr. Patil's examination of Plaintiff, Dr. Richard Bilinsky completed a Physical RFC Assessment. (*Id.* at 61.) Dr. Bilinsky reported that Plaintiff could occasionally lift/carry twenty pounds and frequently lift ten pounds, stand/walk two hours of an eight-hour workday, sit six hours of an eight-hour workday, push/pull without limitation, occasionally stoop, kneel, crouch, crawl, and reach, and never climb ladders, ropes or scaffolds. (*Id.* at 359-62.) Dr. Bilinsky also reported that

there were no treating/examining source conclusions about Plaintiff's limitations or restrictions which significantly differed from his own findings. (*Id.* at 364.)

On August 16, 2006, Dr. Robert Patey, a state agency medical consultant, reported that he reviewed all of the evidence in Plaintiff's file and affirmed Dr. Bilinsky's findings. (*Id.* at 381.)

### 3. *Vocational Expert's Testimony*

A vocational expert ("VE") testified at the hearing that McClinton has worked as a medical transcriptionist and a payroll clerk. (*Id.* at 41.) The VE explained that the medical transcriptionist position is defined as a sedentary, semi-skilled position and that the payroll clerk position is defined as a sedentary, low end semi-skilled position. (*Id.* at 41-42.) The VE stated that there were no transferable skills from either position. (*Id.* at 42.) In his first hypothetical question, The ALJ asked the VE whether McClinton could perform her previous jobs if she were limited to light work.[4] (*Id.*) The VE concluded that Plaintiff could perform the work required by the

_____

[4] The ALJ's first hypthetical was somewhat more complicated:
> [P]lease assume a person of claimant's age, education, work experience and skill set who's able to lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently, and light work as defined by the regulations. Less than occasionally climbing ladders, ropes, or scaffolds. Occasionally climbing ramps or stairs. Occasionally balancing. Occasionally stooping. Occasionally crouching. Occasionally kneeling. Never crawling. Occasionally reaching overhead bilaterally. Frequently handling objects meaning gross manipulations. Frequently fingering, meaning fine manipulation of items no smaller than the size of a paperclip. Avoiding concentrated exposure to unprotected heights. Can an individual with these limitations perform claimant's past work as claimant performed or as customarily performed?

payroll clerk position, but not the medical transcriptionist position. (*Id.*) In his second hypothetical question, the ALJ asked the VE to assume the same factors and limitations reflected in the first hypothetical question, except that the exertion level would be reduced from light to sedentary. (*Id.*) Assuming those limitations, the VE concluded that, under the new condition, Plaintiff would not be able to perform the work required by the payroll clerk position as she had performed it, but that she would be able to perform the work required by the payroll clerk position as the Dictionary of Occupational Titles ("*Dictionary*") describes it. (*Id.* at 43.)

In his third hypothetical question, the ALJ asked the VE to assume the same factors and limitations reflected in the second hypothetical question, but that the person would have to be allowed the option to sit or stand alternatively at will provided that the person is not taken off task more than ten percent of the work period. (*Id.*) Assuming those limitations, the VE concluded that Plaintiff could perform the work required by the payroll clerk position as the *Dictionary* describes it. (*Id.*) In his last hypothetical question, the ALJ asked the VE to assume the same factors and limitations reflected in the third hypothetical question, but that any lifting would have to be occasional and less than five pounds. (*Id.*) Assuming those limitations, the VE concluded that Plaintiff could not perform any of her past work as performed or as customarily performed. (*Id.*)

C.    **ALJ Decision**

In his findings, the ALJ stated that McClinton met the disability insured status requirements of the Social Security Act through December 31, 209, and further found that she had not engaged in substantial gainful activity since her disability date. (R. 54.) The ALJ found that she suffered from the following severe impairments: degenerative disc disease of the cervical spine, spinal stenosis, obesity, and gastro-esophageal reflux disease. (*Id.*)  The ALJ determined that these conditions, alone or in combination, did not meet or medically equal any Listing. (*Id.* at 55.)

The ALJ determined that McClinton had the residual functional capacity

> to perform sedentary work, *i.e.*, she is able to lift up to 10 pounds occasionally, less than 10 pounds frequently, she can stand or walk for approximately 2 hours of an 8 hour workday, and can sit approximately 6 hours of an 8 hour workday, with the additional limitation of allowing claimant the option to sit or stand alternatively at will provided the claimant is not taken off task more than 10% of the work period. Claimant can frequently handle objects (defined as gross manipulation) and frequently finger objects (defined as fine manipulation). Claimant can occasionally climb ramps/stairs and can occasionally reach overhead. She can occasionally balance, stoop, crouch, and kneel. Claimant can less than occasionally climb ladders/ropes/scaffolds. She can never crawl. Claimant must avoid concentrated exposure to unprotected heights.

(*Id.* at 56.) After considering the evidence, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause the

alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment," Plaintiff's medical records, and her own testimony. (*Id.*)

The ALJ recited most of Plaintiff's relevant medical history and a significant portion of her testimony. (*Id.* at 57-60.) He found that Plaintiff lacked credibility because of the inconsistencies in her testimony and her generally unpersuasive appearance and demeanor while testifying at the hearing. (Id. at 60.) He accorded little weight to Dr. Kohn's opinion because he determined that the doctor's RFC assessment was conclusory, provided very little explanation of the evidence relied on in making the assessment, and contradicted the evidence in his own report. (*Id.* at 61.) The ALJ also accorded little weight to Dr. Hatter-Stewart's opinion. (*Id.*) He explained that Plaintiff's impairments seemed to be outside the doctor's area of expertise, and that the record suggested that Plaintiff was seeing Dr. Hatter-Stewart primarily in order to generate evidence for her disability application and appeal. (*Id.*) The ALJ accorded substantial weight to the opinion of Dr. Patil, whose opinion the ALJ claimed contradicts those of both Dr. Kohn and Dr. Hatter-Stewart. (*Id.*) Additionally, the ALJ accorded some weight to the opinions of Drs. Bilinsky and Patey. (*Id.*)

The ALJ determined that Plaintiff was capable of performing past relevant work as a payroll clerk. (*Id.* at 62.) In making his decision, the ALJ explained the VE's testimony and his agreement with her conclusion that Plaintiff would be able

to perform the requirements of the payroll clerk position as customarily performed. (*Id.*) Therefore, he found that McClinton was not disabled under the Social Security Act. (*Id.* at 63.)

## DISCUSSION

## I. ALJ LEGAL STANDARD

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed?  (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). A negative answer at any step, other than at step 3, precludes a finding of disability. *Id.* The claimant bears the burden of proof at steps 1-4. *Id.*

Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy. *Id.*

## II. JUDICIAL REVIEW

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error. *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence

14

with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

## III.    ANALYSIS

In her motion for summary judgment or remand, McClinton alleges a number of errors related to the ALJ's determination, including: (1) the ALJ's credibility determination was flawed; (2) the ALJ's Step Four finding was based on inaccurate testimony; and (3) the ALJ improperly weighed medical opinions and evidence.

### A.    Credibility

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *See Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *see also Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (quoting *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006)) ("'Only if the

trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed.'"). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88).

When assessing the credibility of an individual's statements about pain or other symptoms and their functional effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[5] In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own observations of the individual as part of the overall evaluation of the credibility of the individual's statements. *Id.*

In this case, after reciting portions of Plaintiff's testimony, the ALJ determined that while the "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional

---

[5] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

capacity assessment, the claimant's medical records, and her own testimony." (R. 56.) Then, the ALJ went on to explain which elements of Plaintiff's testimony undermined her credibility. Specifically, he noted that Plaintiff provided inconsistent information regarding her daily activities:

> Despite her testimony that her symptoms drastically worsened in spring/summer 2008, there are few medical records since that time, and the medical records since that time do not detail a worsening condition. Furthermore, the claimant completed an Activity of Daily Living Report in December 2005 in which she claimed that since that time she has been unable to sit for longer than a half hour, has had difficulty cooking because lifting pots and pans, or even pouring coffee or milk, is too painful, and was unable to fill out the forms in question without severe pain and frequent naps lasting several hours. This testimony appears to directly contradict the claimant's hearing testimony that until at least spring of those year she was able to take walks, garden, sew and participate in social activities.

(*Id.*) Additionally, in terms of her medical treatment, the claimant testified that she was told by a physician that surgery would not help her pain because her degenerative disc disease and arthritis were too severe. The ALJ pointed out that "[t]here are no records in her file that document that conversation; however, there are records . . . which document both a physician's recommendation of surgery and the claimant's refusal of it." (*Id.*) The ALJ also determined that the claimant's "generally unpersuasive appearance and demeanor while testifying" influenced his decision: "The claimant was able to participate in the hearing closely and fully without distraction caused by pain, and was able to participate in the hearing without any overt pain behavior." (*Id.*)

17

Plaintiff argues that the ALJ skewed her testimony to portray it as internally contradictory. Specifically, she explains that at the hearing, she testified that she was able to do only "a little bit" of gardening, and that her church visits only lasted about one to one-and-a-half hours. She also claims that she did not testify as to when she was last able to sew. The Court understands that some portions of Plaintiff's testimony could be interpreted in different ways, and that the ALJ's conclusions about her credibility could be faulty, but the Court cannot say that the ALJ's credibility finding is "patently wrong," as is required for reversal on this issue. *Schmidt*, 496 F.3d at 843. Plaintiff also claims that the ALJ failed to consider Plaintiff's lack of health insurance as a contributing factor to the limited care sought by Plaintiff in 2008, but the ALJ did consider that information and reasonably concluded that it failed to explain the dearth of evidence showing worsening symptoms or the pursuit of alternative treatments or sources of care. (*Id.*)

## B.    The ALJ's Step Four Finding

Under the commissioner's rulings, a claimant's application may be denied at step four under two scenarios: 1) the claimant retains the capacity to perform the functional demands and job duties of a particular past relevant job as he or she actually performed it; or 2) the claimant retains the capacity to perform the functional demands and job duties of the occupation as generally required by employers throughout the national economy. *Cadenhead v. Astrue*, 2010 WL 5846326, at *21 (N.D. Ill. Mar. 5, 2010) (citing SSR 82-61). The ALJ must "specify

the duties involved in a prior job and assess the claimant's ability to perform the specific tasks." *Nolen v. Sullivan*, 939 F.2d 516, 519 (7th Cir. 1991) *quoted in Kenefick v. Astrue*, 535 F.Supp.2d 898, 909 (N.D. Ill. 2008).

Here, the ALJ determined that Plaintiff was capable of performing her past relevant work as a payroll clerk. (R. 62.) Vocational Expert Kehr testified that Plaintiff's past work was performed as a payroll clerk, defined under the *Dictionary* as being sedentary and low-end semi-skilled. (*Id.* at 41-42.) The ALJ relied on Kehr's testimony and determined that Plaintiff could do her previous work as is customarily performed in the national economy. (*Id.* at 62.) Plaintiff maintains that her past work is consistent with the office clerk position (and not the payroll clerk position) as defined by the *Dictionary* at 209.562-010, and is classified as light work, as opposed to sedentary work. Defendant does not argue that Plaintiff's classification is inaccurate; instead, Defendant claims that the ALJ was entitled to rely upon the vocational expert's testimony since Plaintiff did not raise this issue at the hearing. Defendant's argument is unpersuasive. In response to her own attorney's questions at the hearing, Plaintiff described the nature of her previous work. (R. 38.) When the vocational expert testified that Plaintiff's previous work was performed as a "payroll clerk," she neither explained the duties of that position, nor did she explain how she arrived at the conclusion that Plaintiff worked as a

payroll clerk. (*Id.* at 41-42.) Since Plaintiff had worked as an office clerk *in a payroll department*, the position cited by the vocational expert likely sounded reasonable to Plaintiff. Plaintiff had no reasonable way of knowing that the expert's classification was mistaken.

The ALJ did not specify the duties involved in McClinton's prior job and assess her ability to perform the specific tasks. *Nolen*, 939 F.2d at 519. The ALJ did rely on the vocational expert's testimony, but according to Plaintiff, the vocational expert mistakenly classified Plaintiff's previous work as a "payroll clerk." The Plaintiff makes a persuasive argument that the job of "office clerk," as described in the *Dictionary*, requires the performance of significantly different tasks from those performed by a payroll clerk. Defendant has not offered any evidence to the contrary. Accordingly, on remand, the ALJ should develop a better record in order to determine whether Plaintiff's past work adequately corresponds to any job described in the *Dictionary* as evidence that Plaintiff is able to perform her past relevant work as generally performed in the national economy. *Lipke v. Astrue*, 575 F. Supp. 2d 970, 983 (W.D. Wis. 2007).

## C. Consideration of Medical Evidence and Opinions

Plaintiff also argues that the ALJ improperly weighed medical opinions and evidence, which led to an erroneous RFC finding. Defendant maintains that the ALJ properly weighed all of the evidence in the record.

On issues that are not reserved to the Commissioner, a treating doctor's opinion "receives controlling weight if it is 'well-supported' and 'not inconsistent with the other substantial evidence' in the record." *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (quoting 20 C.F.R. § 404.1527(d)(2)). "An ALJ must offer 'good reasons' for discounting the opinion of a treating physician." *Id.* (quoting *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011)). Even if there are sound reasons for refusing to give a treating physician's assessment controlling weight, the ALJ is "required to determine what value the assessment did merit." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)).

Here, the ALJ improperly weighed and/or discounted the medical opinions of some of Plaintiff's treating physicians. The ALJ stated that he accorded little weight to Dr. Kohn's opinion, which he deemed "internally inconsistent." (R. 61.) Specifically, the ALJ said that, "[i]n his examination of the claimant [Dr. Kohn] found minimal evidence of her alleged impairments. [The doctor's] RFC assessment contradicts this evidence, is conclusory, and provides very little explanation of the evidence relied on in forming that opinion." (*Id.*) The ALJ mischaracterized Dr. Kohn's examination report and failed to provide good reasons for discounting his opinion. Furthermore, the ALJ neglected to determine what value Dr. Kohn's assessment did merit.

While Dr. Kohn found that McClinton was "normal" in many respects (skin, range of motion, mental status, cranial nerves, sensation, motor, gait and coordination), he did find that her reflexes were brisk at the left knee and biceps.

(*Id.* at 384-85.) Dr. Kohn also ordered x-rays which showed degenerative changes throughout the cervical spine, with disc space narrowing and prominent anterior ostephyte formation extending from C3 through C7, and mild ostephytic encroachment upon neural foramina bilaterally from C5 through C7. (*Id.* at 58.) Dr. Kohn also reviewed an MRI that showed bulging discs at C3 through C4, and a herniated disc with compression of the spinal cord at C5 through C6. (*Id.* at 382.) Based on the records and his observations, Dr. Kohn found that there was clear evidence of cervical spondylosis with spinal cord compression. (*Id.* at 385) Based on McClinton's brisk reflexes and reflex abnormalities, he also found that there was evidence for myelopathy. (*Id.*) Dr. Kohn explained that a patient with McClinton's anatomic abnormality often complains of poorly localized but distracting pain, and pain that is worse with neck movement, and found that McClinton's symptoms were consistent with that syndrome. (*Id.*) Based on his findings, Dr. Kohn concluded that any return to work would subject her to continued activity-induced pain, and that he could not anticipate such a return absent surgical treatment. (Id at 386.) Dr. Kohn's assessment is not conclusory as the ALJ claimed; instead, it provides a reasonable explanation of the evidence upon which the doctor relied to make his opinion.

Independent of the ALJ's decision, Defendant suggests that Dr. Kohn's statement that McClinton had "no specific deficit on examination" is somehow inconsistent with his statements referring to McClinton's reflex abnormalities. It should first be pointed out that the ALJ did not reference this alleged inconsistency

when he decided to accord little weight to Dr. Kohn's opinion, and this Court will confine its review to the reasons supplied by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). Defendant has simply misunderstood the meaning of "deficit." In this context, deficit most reasonably refers to "a lack or impairment of a functional capacity."[6] Dr. Kohn explained that during his examination, McClinton did not evidence an incapability to perform various tasks and activities. This observation is perfectly consistent with his finding that McClinton had an anatomic abnormality that often resulted in poorly localized but distracting pain. In according Dr. Kohn's opinion "little weight," the ALJ did not provide "good reasons" for discounting the opinion of a treating physician; and, even if the ALJ's reasons were sufficiently articulated, the ALJ does not explain how the "little weight" that was accorded to the doctor's opinion factored into the ALJ's decision.

The ALJ also accorded little weight to the opinion of Dr. Hatter-Stewart, McClinton's treating physician. (R. 61.) The ALJ stated that Dr. Hatter-Stewart's opinion was conclusory, and also said that the record suggested "the claimant was seeing Dr. Hatter-Stewart primarily in order to generate evidence for this application and appeal, rather than in a genuine attempt to obtain relief from the

---

[6] *Deficit Definition*, MERRIAM-WEBSTER'S MEDICAL DICTIONARY (2012), *available at* http://www2.merriam-webster.com/cgi-bin/mwmedsamp?book=medical&va=deficit.

allegedly disabling symptoms." (*Id.*) Furthermore, the ALJ suggested that Dr. Hatter-Stewart's opinion deserved less weight because "the claimant's impairments seem[ed] to be, at least in part, outside the doctor's area of expertise." (*Id.*)

Admittedly, Dr. Hatter-Stewart's opinion lacks some of the detail that Dr. Kohn's and Dr. Patil's opinions offer; however, the opinion does explain how she reached various conclusions about McClinton. The Physical RFC Questionnaire that she filled out indicates her diagnosis (a herniated disc in the cervical spine with radiculopathy), her prognosis (guarded), the type of treatment offered and the patient's response to the treatment, as well as McClinton's symptoms (pain, paresthesias and stiffness). (*Id.* at 251.) In support of her determinations, Dr. Hatter-Stewart identified clinical findings and objective signs of the conditions diagnosed: she noted decreased range of motion, paraspinal tenderness and positive straight leg raising. (*Id.*)

The ALJ did seem to recognize some of the content of the questionnaire, and he even referenced some of the doctor's clinical findings. (*Id.* at 58.) Still, he claimed that Dr. Hatter-Stewart "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." (*Id.*) It is unclear what made this conclusion "apparent." Almost all diagnoses require some consideration of the patient's subjective reports, and certainly McClinton's reports had to be factored into the calculus that yielded the doctor's opinion. The ALJ fails to point to anything that suggests that the weight Dr. Hatter-Stewart accorded

McClinton's reports was out of the ordinary or unnecessary, much less questionable or unreliable. In support of the ALJ's assertion, Defendant argues that a claimant's subjective complaints are not the proper basis of a medical opinion and cites to two cases for support. Both are distinguishable. In *Ketelboeter v. Astrue*, 550 F.3d 620 (7th Cir. 2008), the court explained that "if the treating physician's opinion is . . . based *solely* on the patient's subjective complaints, the ALJ may discount it." *Id.* at 625 (emphasis added). Similarly, the court in *Rice v. Barnhart*, 384 F.3d 363 (7th Cir. 2004) held that "medical opinions upon which an ALJ should rely . . . [ought] not amount merely to a recitation of a claimant's subjective complaints." *Id.* at 371. Here, Dr. Hatter-Stewart's opinion is neither based solely on McClinton's subjective complaints, nor is it a mere recitation of those complaints.

The ALJ's claim that McClinton only saw Dr. Hatter-Stewart for the completion of forms is also unsupported. Not every visit was related to the completion of forms, and simply because Plaintiff was seeking disability and required such paperwork does not mean that the doctor's treatment was any less legitimate. The ALJ simply fails to explain how the completion of necessary paperwork for a patient, however frequent, mitigates the credibility or accuracy of a treating doctor's medical opinion.

As for the ALJ's suggestion that Dr. Hatter-Stewart's opinion deserves less weight because impairments and conditions at issue are partially outside the doctor's area of expertise, this factor is only relevant if the doctor's opinion is not given controlling weight for proper reasons. See 20 C.F.R. § 404.1527 (explaining

that it is only when the treating source's opinion is not given controlling weight that factors including specialization are considered). Assuming, *arguendo*, that the ALJ had proper reasons for not giving controlling weight to Dr. Hatter-Stewart's opinion, it was perfectly acceptable for him to consider the doctor's lack of expertise. The ALJ placed weight on Dr. Hatter-Stewart's area of expertise, but did not do so for Dr. Kohn's specialization and Dr. Patil's lack of expertise in his evaluations of their opinions.

The ALJ accorded substantial weight to the opinion of Dr. Patil. (R. 61.) He explained that the doctor "thoroughly examined the claimant and found minimal evidence of degeneration," and that his opinion was "well supported by medically acceptable clinical and laboratory findings and is consistent with the record when viewed in its entirety." (*Id.*) The ALJ explained that Dr. Patil's opinion contradicts those of Dr. Hatter-Stewart and Dr. Kohn (*Id.*), but fails to explain the inconsistency. Dr. Patil diagnosed Plaintiff with osteoarthritis and central spinal canal stenosis. (*Id.* at 356.) While he did indicate that "there was no deformity, swelling, tenderness or redness of any joint," that "[p]eripheral pulses and sensation are normal bilaterally," and that "[t]here is no shortening of lower extremities or atrophy of extremity muscles," Dr. Patil also explained that the MRI performed in September 2004 "revealed multilevel osteoarthritis, disc bulges and herniations with severe effect upon thecal sac and mild to moderate central spinal canal stenosis," and that an x-ray of both knees showed "early osteoarthritis in August 2004." (*Id.*) While there are some clear differences between the reports of Dr.

Hatter-Stewart and Dr. Patil, those differences alone do not seem significant enough to discredit Dr. Hatter-Stewart's opinion. Additionally, the reports of Dr. Kohn and Dr. Patil are incredibly similar. Most notably, Dr. Kohn diagnosed Plaintiff with cervical spondylosis with spinal cord compression and Dr. Patil diagnosed her with osteoarthritis and central spinal canal stenosis. While it might not have been clear to the ALJ, cervical spondylosis *is* osteoarthritis of the neck,[7] and spinal canal stenosis is a narrowing of one or more areas in your spine that puts pressure on the spinal cord or spinal nerves at the level of compression.[8] Dr. Patil did not offer a prognosis for Plaintiff. He also did not complete a functional capacity evaluation; in fact, in his report, he said nothing regarding what Plaintiff might be able to do despite her impairments. Because of this, it is impossible to determine whether Dr. Hatter-Stewart's and Dr. Kohn's functional capacity findings are inconsistent with Dr. Patil's report.

The ALJ also relied upon the RFC conclusions reached by the physicians employed by the State Disability Determination Services, Dr. Bilinsky and Dr. Patey. (*Id.* at 61.) Neither Dr. Bilinsky nor Dr. Patey treated or examined Plaintiff. Dr. Bilinsky's report suggests that he based his evaluations solely upon Dr. Patil's evaluation (*Id.* at 358-65), and the record reveals that Dr. Patey merely affirmed

---

[7] *Cervical Spondylosis*, Am. Acad. of Orthopaedic Surgeons, http://orthoinfo.aaos.org/topic.cfm?topic=a00369 (last visited Jan. 24, 2012).

[8] *Spinal Stenosis*, Am. Coll. of Rheumatology, http://www.rheumatology.org/practice/clinical/patients/diseases_and_conditions/stenosis.asp (last visited Jan. 24, 2012).

Dr. Bilinksy's report. (*Id.* at 380-81.) One of the questions in the RFC Assessment that Dr. Bilinsky completed asks, "If [a treating or examining source statement regarding the claimant's physical capacities is in the file], are there treating/examining source conclusions about the claimant's limitations or restrictions which are significantly different from your findings?" (*Id.* at 364.) Dr. Bilinsky indicated that there were no such conclusions. (*Id.*) The ALJ does not comment on this, but it seems as if there are two possibilities: (1) The opinions of Dr. Hatter-Stewart and Dr. Kohn were not available to Dr. Bilinsky when he completed his assessment; or (2) Dr. Bilinsky did not find the conclusions of Dr. Hatter-Stewart or Dr. Kohn to be significantly different from his own findings. If the former is the case, then Dr. Bilinsky's findings lose significant value as he failed to account for significant information in making his RFC assessment; if the latter is the case, it cuts against the ALJ's finding that the opinions of Drs. Hatter-Stewart and Kohn are contradicted by the other opinions in the record. To the extent that there are inconsistencies between Dr. Bilinsky's findings and those of Drs. Hatter-Stewart and Kohn, generally, the ALJ is to give more weight to the opinion of examining doctor(s) than non-examining doctor(s). 20 C.F.R. § 404.1527(d)(1). Here, the ALJ admitted as much, but seemed to determine that Dr. Bilinsky's opinion (and its subsequent affirmation by Dr. Patey) deserved more weight than the independent opinions of Drs. Hatter-Stewart and Kohn. (R. 61.) The ALJ's reasoning in support of such a conclusion was insufficient.

The ALJ failed to consider relevant medical evidence and opinions, and erroneously discounted the opinions of some of Plaintiff's examining physicians; therefore, the Court concludes that the matter must be remanded to the Commissioner for a thorough consideration of all of the medical evidence in the record and a detailed explanation of why certain evidence was given greater or lesser weight. The Court expresses no opinion about the decision to be made on remand but encourages the Commissioner to use all necessary efforts to build a logical bridge between the evidence in the record and his ultimate conclusions, whatever those conclusions may be. *See, e.g., Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("On remand, the ALJ should consider all of the evidence in the record, and, if necessary, give the parties the opportunity to expand the record so that he may build a 'logical bridge' between the evidence and his conclusions."); *see Smith v. Apfel,* 231 F.3d 433, 437 (7th Cir. 2000)*; Luna v. Shalala,* 22 F.3d 687, 693 (7th Cir. 1994). The Commissioner should not assume that any other claimed errors not discussed in this order have been adjudicated in his favor. On remand, the Commissioner therefore must carefully articulate his findings as to every step.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [Doc. No. 24] is granted in part and denied in part, and Defendant's motion for summary judgment [Doc. No. 38] is denied.  The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this opinion.


SO ORDERED.                    ENTERED:

                               _Maria Valdez_
DATE: **February 6, 2012**     _____

                               **HON. MARIA VALDEZ**

                               **United States Magistrate Judge**